IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICK BRIAN FARRONE

              Plaintiff

    v.

PETER C. ACKER and THE COUNTY OF
MERCER, PENNSYLVANIA

              Defendants

CIVIL DOCKET NO.  2:23-CV-1528

JURY TRIAL DEMANDED

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

AND NOW, comes Defendant, Peter C. Acker, by his attorneys, Marshall Dennehey, P.C. and G. Jay Habas, Esquire, and in support of his Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56, submits this Memorandum of Law.

### I.    SUMMARY OF ARGUMENT

There is no genuine dispute of fact that Mercer County District Attorney Peter Acker did not terminate Brian Farrone's employment because he opposed gender and/or disability discrimination against others.  To the contrary, the Plaintiff's insubordination and attitude in decrying Mr. Acker's reassignment of eight cases to him following the resignation of an Assistant District Attorney was the act that prompted Mr. Acker to end the employment.

The undisputed facts establish that on May 18, 2020, Mr. Farrone sharply criticized and challenged Mr. Acker's management of his office in an email to Mr. Acker.  Plaintiff strongly disagreed with Mr. Acker's practice of holding the Assistant District Attorneys accountable for their cases.  He blamed Mr. Acker's demanding standards for Assistant District Attorneys leaving.  Plaintiff personalized his displeasure by complaining about the responsibility for the cases reassigned to him, and ended his declaration of defiance by challenging Mr. Acker to "take all these cases to make sure that they are handled to your satisfaction."

The May 18, 2020 email pointedly makes no statement opposing any discriminatory practice by Mr. Acker.

Mr. Acker's response to the Plaintiff's diatribe was swift and appropriate.

On May 19, 2020, he terminated the Plaintiff's employment. Among the reason given was: "Your refusal to assume these 8 sex cases is insubordination, pure and simple." He reported the same thing to the departing Assistant District Attorney that day: "Brian has refused to handle the sex cases."

Plaintiff has attempted to recharacterize his firing in order to fit within the narrow protection of the Pennsylvania Human Relations Act by claiming that it was based on his opposition to gender or disability-based discriminatory practices by Mr. Acker, particularly involving Assistant District Attorney Stephanie Lauderbaugh.

The material facts of record confirm that there is no evidence that Mr. Farrone reported discriminatory treatment by Mr. Acker or that Mr. Farrone was fired because he opposed discriminatory practices. The facts demonstrate that Mr. Acker did not discriminate against the Assistant District Attorneys in his office and treated them the same - all were held to his expectations in performing their job. There is no dispute that it was Mr. Farrone's personal opposition to Mr. Acker's management style, not an attempt to stand up to discrimination against Attorney Lauderbaugh or others, that prompted his removal.

The Plaintiff's claim against Mr. Acker under the "opposition" clause of the Pennsylvania Human Relations Act is not supported by material facts to establish a *prima facie* case of retaliation for engaging in protected activity. Furthermore, Mr. Acker had legitimate, non-retaliatory reasons for terminating the Plaintiff which are not pretextual. As a result, there is no genuine dispute of fact that would permit this claim to proceed such that Defendant Peter Acker is entitled to summary judgment as a matter of law on the sole claim against him.

2

II.    **MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

The factual basis for Mr. Acker's Motion for Summary Judgment is set forth in a separate Concise Statement of Undisputed Material Facts pursuant to Western District of Pennsylvania Local Rule 56(B)(1) and is hereby incorporated by reference. The following summarizes the key facts that support the Defendant's Motion for Summary Judgment.

The Plaintiff was employed as the Mercer County First Assistant District Attorney. On or about February 1, 2019, Defendant Acker became the District Attorney for Mercer County, with authority over the Plaintiff and others who worked in the District Attorney's Office.

Plaintiff was the First Assistant District Attorney under Mr. Acker. He had worked in the District Attorney's Office for many years, under three other District Attorneys. Plaintiff viewed Mr. Acker as the most demanding and aggressive of all the District Attorneys he worked with, and disagreed with the manner in which he ran his office and the expectations he placed on the Assistant District Attorneys in prosecuting their cases.

Indeed, Mr. Acker's philosophy as District Attorney, borne out by his 40 years in practice as both a civil and criminal attorney, was that cases needed to be zealously and aggressively prosecuted, that it was important to communicate with the attorneys about cases to ensure that they were being prosecuted aggressively, and that delays in cases did not help the prosecution. This approach is reflected in the emails that he sent to all the attorneys, including Mr. Farrone, on a consistent basis noting the cases that were tried, resolved or continued, the issues that the prosecutors needed to address on cases, and the successes and failures of his team.

The issues that Mr. Farrone had with Mr. Acker manifested themselves on Monday, May 18, 2020, after Mr. Acker had assigned eight cases to the plaintiff from among dozens of files that were reassigned after senior Assistant District Attorney, Stephanie Lauderbaugh, submitted her letter of resignation to Mr. Acker on Friday, May 15, 2020.

After receiving Ms. Lauderbaugh's resignation, Mr. Acker took it upon himself to reassign her cases, which he did in a series of emails sent out over the weekend of May 15-17, 2020. He reassigned eight sex cases that Ms. Lauderbaugh handled to Mr. Farrone. The Plaintiff was the most experienced prosecutor in the office and had prosecuted sex crimes in his career, so Mr. Acker rightfully thought it was appropriate to assign those cases to him.

On May 18, 2020, in an email to Mr. Acker addressing why he had not responded to Mr. Acker's emails regarding the reassignments, Plaintiff said he was "still processing the fact that Stephanie was leaving. It really is not possible for me to do trials in addition to my existing responsibilities of reviewing and assigning the cases, as well as everything else that I do in a normal day. I would like to discuss this with you further."

Mr. Acker immediately replied that while he would be happy to discuss the situation with Mr. Farrone, they were "down a senior ADA, her cases have backed up, we only have 3 other senior ADAs all of whom have their own homicides and other cases." He then offered to take some of the Plaintiff's work, but that "[e]very senior attorney in the office has to pitch in, even you. These files are your responsibility, I expect you to handle them and reallocate your time to make it happen."

Plaintiff's response to Mr. Acker, sent in an email 24 minutes later, states:

> Do you think that the e-mails that you sent to Stephanie were nice? They were borderline threatening. Additionally, you had promised that you would let me handle Stephanie, but you chose to keep harassing her on her cases. What did you think was going to be the result? She left without another job and three children to support. What does that tell you? I'm not sure why you think my duties are not full time. I will tell that in addition to the informations that I review and assign. I spend a huge amount of time dealing with the concerns of the remaining ADAs, as well as other entities that interact with our office. I'm not sure why you feel that these files are my responsibility, when you continued to micro-manage her handling of the cases, despite your agreement to let me, and ultimately were the direct cause of her departure. I know you were concerned about her moving her cases, but as far as I know she

4

never lost any cases to Rule 600. This is the criminal world not the
civil world. I just don't think you understand the difference.
These cases are not just about money, there are a lot of other
aspects that come into play. Stephanie may not have been the most
aggressive prosecutor, but she was not a good employee, who
came to work and did her job, until she felt it was impossible to
continue working here. It is hard to watch these young attorney's
confidence being undermined by being second guessed instead of
encouraged. You had several extremely competent trial attorneys
who left because of your behavior. As a result, I am now expected
to carry the burden that you have created? I'm not sure I am
capable of prosecuting these cases to your satisfaction or within
your very strict timeline. Maybe, you should take all these cases to
make sure they are handled to your satisfaction and it would also
give you some insight as to why cases don't get resolved as
quickly as you would like.

Noteworthy by its absence from the email is any allegation that Mr. Acker discriminated

against anyone in the District Attorney's Office on the basis of gender and/or disability, or that

Plaintiff was advocating for anyone who Mr. Acker discriminated against.

Mr. Acker responded immediately - "Perhaps I should get a new FADA!"

He then terminated the plaintiff the next day, May 19, in a letter detailing his reasons and

addressing the accusations made against him in Mr. Farrone's May 18 email, stating in part:

- "I believe that the FADA should share the same basic philosophies of the District Attorney and it is obvious that you do not."

- "Your comment [that I created this mess and I should take all those cases so I would understand why cases languish] is an insult and demonstrates your total lack of respect for me."

- "Your refusal to assume these 8 sex cases is insubordination, pure and simple."

- "You apparently believe that you can do solely what you want to do and no one, not even your boss, can provide additional assignments to you. You have clearly demonstrated that you are not a team player, nor a leader."

- "I have repeatedly requested that you address with various ADAs their perpetual failures month after month to move major cases forward and take actions to compel that to happen. Instead you asserted that I was being too rough on them."

- "Your failure to cause ADAs to move their cases forward and permit them to languish have created a myriad of problems."

5

- "These 15.5 months have demonstrated that you are not essential. You are way too much bother for what you contribute, and it is time that our office moves on without you."

## III.   <u>STANDARD OF REVIEW</u>

In deciding a motion for summary judgment, this Court is governed by Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 267 (3d Cir. 1991). An issue is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, where the record, viewed as a whole, could not "lead a rational trier of fact to find for the non-moving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

Once a party moves for summary judgment, the non-moving party has the burden of demonstrating "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot rest on conclusory allegations but must instead point to specific facts in the record showing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the non-moving party proffers evidence that is "merely colorable" or is "not significantly probative," summary judgment should be granted. *Anderson, supra*, 477 U.S. at 249. Further, mere speculation, suspicion, metaphysical doubt or evidence that is not sufficiently probative will not defeat summary judgment. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1085 (3d Cir. 1992).

In this case, the material facts of record support summary judgment in favor of Defendant Peter Acker.

## IV.    ARGUMENT

**There Is No Genuine Issue Of Material Fact That Plaintiff Did Not Engage In Protected Conduct Under the Pennsylvania Human Relations Act, and That His Employment Did Not Terminate Because of Such Protected Conduct**

### A.  Limited Nature of "Oppositional" Claim under PHRA

The Plaintiff's claim against defendant Mr. Acker is based on the "opposition" clause of §955(d) of the Pennsylvania Human Relations Act, which provides that it is an unlawful discriminatory practice "[f]or any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this Act."  43 P.S. §955(d).[1]

The "opposition" clause of the PHRA is similar to that under Title VII of the Civil Rights Act and the Americans with Disabilities Act in that it provides limited, narrow protection from retaliation against a person for opposing a discriminatory practice.  *Goosby v. Johnson & Johnson Med.*, 228 F.3d 313, 317, n. 3 (3d Cir. 2000) ("The analysis required for adjudicating Goosby's claim under PHRA is identical to a Title VII inquiry."); *Burton v. Teleflex, Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (treating PHRA claims as identical to ADEA and Title VII claims); *Slagle v. County of Clarion*, 435 F.3d 262, 266, n.5 (3d Cir. 2006) (citing cases, including *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978) (stating that the opposition clause serves "a more limited purpose" and is narrower than the participation clause)); *Hubbell v. World Kitchen, LLC*, 668 F.Supp.2d 401, 440 (W.D. Pa. 2010) ("The opposition clause … serves 'a more limited purpose' than that served by the participation clause.") (citing *Sias, supra*).

---

[1] The "participation" provision in the second part of § 955(d), making it an unlawful discriminatory practice to retaliate "because an individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this Act," does not apply in this case as there is no contention that plaintiff made a charge, testified or assisted in any investigation, proceeding or hearing under the Human Relations Act.  There also is no dispute that Mr. Acker is a "person" or "employer" or that Mr. Farrone is an "individual" under the statute.

The *Hubbell* case is instructive in evaluating the limited scope of an actionable oppositional claim under the PHRA.  In that case, the plaintiff alleged that she was subjected to a hostile work environment and discrimination because of her race, sex and age in violation of the PHRA, Title VII and ADEA following her termination as a result of repeated clashes with co-workers and management on various issues.  In finding that the plaintiff failed to establish a *prima facie* claim of harassment to defeat summary judgment, the Court noted that the cited laws "do not countenance a 'cause of action for mere unpleasantness' in the workplace," as the plaintiff must show that the "conduct in issue was motivated by the fact that the plaintiff is a member of a protected class."  668 F.Supp.2d at 420, 422 (citing *Koschoff v. Henderson,* 109 F.Supp.2d 332, 346 (E.D. Pa. 2000) ("mistreatment and disrespect unmotivated by the plaintiff's [statutorily-protected trait] does not create a hostile work environment") (citing *Oncale v. Sundower Offshore Services, Inc.,* 523 U.S. 75, 80-81 (1998) ("plaintiff must prove that the conduct at issue … actually constituted *discrimination* because of" the protected category).

With regard to the plaintiff's claim she was disciplined in retaliation for writing a letter to her employer complaining about her co-workers, the court stated that "for a letter authored by an employee to constitute activity protected under the opposition clauses of Title VII, the ADEA and the PHRA, 'it must be possible to discern from the context of the [letter] that the employee opposes an unlawful employment practice.' *Curay–Cramer v. Ursuline Acad. of Wilmington,* 450 F.3d 130, 135 (3d Cir. 2006)." *Id.* 440 (protected activity does not involve complaints about unfair treatment which do not reference a protected characteristic as the basis for the unfair treatment.).  In rejecting the claim of retaliation for the employee's letter about her co-workers, the court noted that the limited protection under the opposition clause to those who specifically oppose an unlawful employment practice "does not extend to certain forms of 'opposition' that have the effect of disrupting one's work environment." *Id.*

8

**B. Plaintiff Does Meet His Burden of Proving He Engaged in Protected Conduct**

To establish a *prima facie* case of retaliation, the Plaintiff must show that: (1) he engaged in protected conduct; (2) he was subject to an adverse employment action subsequent to the protected activity; and (3) a causal connection between the protected activity and the adverse action. *Barber v. CSX Distribution Services,* 68 F.3d 694, 70 (3d Cir. 1995); *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

In this case, the undisputed evidence establishes that the plaintiff was not engaged in protected conduct in his communication with Mr. Acker which prompted the termination of employment, such that summary judgment should be entered in favor of Mr. Acker.[2]

*1. Protected Conduct Must Be Specifically Identified*

The law is well established that a statement of the type made by Plaintiff to Mr. Acker on May 18, 2020, is not protected conduct.

In *Daniels*, a teacher brought an action against the school district and principal Mason alleging discriminatory retaliation under the ADEA and PHRA. Plaintiff's claim was based upon five instances of alleged protected conduct. The first involved a complaint by the plaintiff to the principal that the principal's statement that some of the teachers are old enough to be grandparents was ageist and offensive, and the second asserted the principal excessively monitored her. The other complaints involved a letter sent to school administrators claiming she had been subject to a hostile work environment because of her age, and two PHRC Complaints involving age and race discrimination, and retaliation. 776 F.3d at 194.

The Court of Appeals held that the plaintiff's two complaints to the principal were not protected activity such that summary judgment thereon was appropriate. The statement about the

---

[2] Defendant Acker does not dispute that as the District Attorney he had the authority to and did terminate the plaintiff's employment, therefore, there is no issue about an adverse employment action, only whether there was protected activity and the causation of the termination to a protected activity.

age of the teachers was deemed "not a protected activity because no reasonable person could believe that Mason's statement, by itself, constituted unlawful age discrimination." *Id.* The court explained that the comment did not specifically refer to or denigrate the ability of older teachers to perform their duties, and the plaintiff's subjective belief that the principal's statement violated the law "does not suffice for her complaint to qualify as protected conduct." *Id.* at 194-95, citing *Curay-Cramer, supra,* 450 F.3d at 137 ("[T]he plaintiff's subjective state of mind is … irrelevant for purposes of determining whether she engaged in protected conduct.").

Similarly, with respect to the plaintiff's second statement involving excessive monitoring, this allegation failed to "demonstrate that she related her complaints to age or race discrimination such that the complaints could have qualified as protected activity." *Id.* at 195 (citing *Slagle,* 435 F.3d at 268 (holding that "vague allegations of 'civil rights violations' without reference to discrimination based on any protected category did not constitute protected conduct."), and *Barber,* 68 F.3d at 702 (holding that plaintiff's "general complaint of unfair treatment does not translate into a charge of illegal age discrimination.").

In affirming summary judgment based on these two communications, the court in *Daniels* emphasized that the "anti-discrimination employment statutes are not intended to establish general standards for conduct of employers in dealing with employees." *Id.*, citing *Curay-Cramer, Slagle, Barber, supra.* The standard for protected activity is that the "complaint must allege that the opposition was to discrimination based on a protected category, such as age or race," and requires an "objectively reasonable belief" that the activity plaintiff opposed constituted unlawful discrimination" under the statutes. *Id.* at 193-94 (case citations omitted).

In contrast, the Court noted that the plaintiff's letter to the school district administrators specifically set forth that she experienced age discrimination sufficient to qualify as a protected activity under the ADEA and PHRA, and that the formal complaints to the PHRC containing

similar allegations of mistreatment based on age, race and other protected conduct were protected activities. *Id.* at 195.

In *Barber*, plaintiff complained of age discrimination where a younger candidate was promoted over him for account executive, and retaliation when his position was eliminated after he sent a letter to the employer complaining of unfair treatment and that the other person's selection as executive. In upholding judgment in favor of the defendant on the retaliation claim, the court noted that the letter did not specifically complain about age discrimination, thus it did "not constitute the required 'protected conduct.'" 68 F.3d at 701-702. In particular, the court found the letter was "just too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the ADEA," where it did not "explicitly or implicitly allege that age was the reason for the alleged unfairness." *Id.* at 702. The plaintiff's statement was thus no more than "[a] general complaint of unfair treatment [that] does not translate into a charge of illegal age discrimination." *Id.* at 702.

Just as the communications in *Daniels, Barber, Slagle* and *Curay-Cramer* were found to be insufficient to establish a claim of retaliation based on protected conduct for opposing discrimination and thus warrant summary judgment, so too should the communications upon which Mr. Farrone's claim of protected activity is based as set forth in the Concise Statement of Material Facts be deemed insufficient to withstand summary judgment in favor of Mr. Acker.

### 2. *Plaintiff's Communication with Defendant Acker Does not Meet the Standard for Protected Conduct Where he Did Not Complain to Acker About Discrimination*

The Plaintiff's May 18, 2020 email notes several disagreements with Mr. Acker's management of the Assistant District Attorneys, but none of them involve protected conduct as a matter of law where they contain no complaint that Mr. Acker discriminated against the ADAs.

First, Plaintiff questions Mr. Acker whether emails that Mr. Acker sent to Ms. Lauderbaugh "were nice." Mr. Farrone characterizes the emails as "borderline threatening." Farrone email 5/14/20. Although the Plaintiff does not identify the emails that he is referring to, his labeling of the communications sent by Mr. Acker to Ms. Lauderbaugh as not "nice" and "borderline threatening" does not amount to an assertion of discrimination against Ms. Lauderbaugh by Mr. Acker so as to involve protected conduct based on the law.

A review of the emails by Mr. Acker to Ms. Lauderbaugh as set forth in the Concise Statement of Facts and Exhibits thereto, indicate merely that Mr. Acker communicated that she needed to be prepared to try a particular criminal case (Jaylaun Coleman) starting June 9, 2020, where that case has been pending since October, 2019, and for which several continuances had already been granted and on which Mr. Acker had an ongoing dialogue with Ms. Lauderbaugh.

In particular, in his email of May 14, 2020, Mr. Acker is imploring Ms. Lauderbaugh to get medical records for a Court expert so that they can be reviewed and a report generated with the trial term in 25 days, noting that the discussion about getting the records for the expert "started 6-8 weeks ago at least," and the excuse that defense counsel was not getting the records was "unacceptable." Knowing that the "time is getting tight" to obtain the expert's report for trial, Mr. Acker rightfully expressed that "I expect you to get this done and I expect this case to be tried starting June 9, 2020 absent no criminal jury trials occurring." *Id.*[3]

Second, Plaintiff states that Mr. Acker promised that he would let Mr. Farrone handle Ms. Lauderbaugh, but claims that Mr. Acker "chose to keep harassing her on her cases." Farrone email of May 18, 2020. Neither statement accuses Mr. Acker of discriminating against Ms. Lauderbaugh on the basis of her gender or a disability, only that Plaintiff believed that Mr. Acker

---

[3] Of note, Mr. Acker concluded the email by directing Mr. Farrone to take responsibility to "closely oversee this case so the records get obtained immediately, sent to Dr. Wright, that we get Dr. Wright's report back and that this case gets tried starting June 9, 2020."

pushed her in handling her cases, which is not discrimination.  Moreover, the harassment that

Plaintiff asserts is Mr. Acker's insistence that Ms. Lauderbaugh advance her cases to trial and

not let them languish, an issue that he had addressed with her – and the other ADAs, on a regular

basis, which is consistent with his approach as District Attorney as set forth in the multiple

emails he directed to his ADAs, and Mr. Farrone, on this issue.

Plaintiff then blames Mr. Acker's case management for Ms. Lauderbaugh's departure,

although Ms. Lauderbaugh did not state that in her resignation letter, where she said: "I enjoyed

my employment in the District Attorney's Office.  I also enjoyed working as an Assistant District

Attorney under your supervision; however, it is time for me to pursue another career

opportunity."  She further said to Mr. Acker: "It has been a pleasure working under your

leadership. You are always concerned with what is best for the office and ensuring the office

functions properly.  I thank you for that, and I also thank you for the guidance you provided as a

boss.  It has truly been great working for you and the office."  She also never told Mr. Acker that

her departure was in any way related to any discrimination against her.

The third point in Plaintiff's email of May 18 to Mr. Acker was his response to Mr.

Acker's statement that "[e]very attorney in the office has to pitch in, even you.  These files are

your responsibility, I expect you to handle them to reallocate your time to make it happen."

Plaintiff took issue with this challenge, replying:  "I'm not sure why you think my duties

are not full time.  I will tell that in addition to the informations that I review and assign.  I spend

a huge amount of time dealing with the concerns of the remaining ADAs, as well as other entities

that interact with our office.  I'm not sure why you feel that these files are my responsibility,

when you continued to micro-manage her handling of the cases, despite your agreement to let

me, and ultimately were the direct cause of her departure."

Instead of acknowledging that his boss has directed him – like the other ADAs – to "pitch in" and take over some of the files that Ms. Lauderbaugh had handled, Plaintiff rebuffs Mr. Acker's directive and disdains responsibility for the files, asserting that he is too busy with other work to take them on. These statements demonstrate Plaintiff's concern for his workload, and blaming Mr. Acker for Mr. Lauderbaugh's departure, but do not include any accusation of discrimination against the other ADAs, including Ms. Lauderbaugh.

The next point in Plaintiff's email is his blatant challenge to Mr. Acker's experience and approach to case management, stating "This is the criminal world not the civil world. I just don't think that you understand the difference. These cases are not about money, there a lot of other aspects that come into play." These statements – on their face – are insubordinate and inappropriate, and themselves would justify the termination of employment. But critically, they do not contain any accusation of discrimination against Mr. Acker.

Plaintiff then disagrees with how Mr. Acker dealt with the ADAs in their work, stating that he had "several extremely competent trial attorneys who left because of your behavior," including Ms. Lauderbaugh, which he claims was because their "confidence was undermined by being second guessed instead of encouraged." He then calls out Mr. Acker, stating: "As a result, I am now expected to carry the burden that you have created?"

These statements continue the Plaintiff's disagreement with Mr. Acker's assignment of cases to him as he would then have to "carry the burden" for those who left because of what he views as a lack of support and encouragement. None of which asserts discriminatory conduct.

Finally, the Plaintiff sums up the theme of his email communication – disagreeing with Mr. Acker's approach to how the District Attorney's Office should prosecute cases, as well being assigned cases to handle himself, stating: "I'm not sure I am capable of prosecuting these cases to your satisfaction or within your strict timeline. Maybe, you should take all these cases to

14

make sure they are handled to your satisfaction and it would give you some insight as to why cases don't get resolved as quickly as you would like." This contention by the Plaintiff clearly exhibits no assertion of discrimination or other protected activity on behalf of others or himself.

The Plaintiff's statements challenging Mr. Acker's management of the District Attorney's office reflect his personal dissatisfaction with the defendant's communication and leadership style, but notably do not contain any mention of opposition to discrimination based on a protected category activity, as required. *Curay-Cramer,* 450 F.3d at 136 ("[A] general complaint of unfair treatment" that cannot be reasonably construed as related to discrimination is insufficient). Plaintiff's personal disagreement with Mr. Acker and charge that he is responsible for the ADA's dissatisfaction is legally insufficient. As noted in *Burns v. McDonough*, 2024 WL 4205577 * 1 (E.D. Pa. 2024), "Title VII does not mandate a happy workplace. Discrimination and poor management are both bad for the workplace, but only one of them is illegal."

In *Burns*, the District Court found that the plaintiffs "worked for a difficult boss who assigned them work above their paygrade, failed to support them, and berated them in front of their colleagues," but there was "no evidence that their superior treated them this way because of their race or sex," and the supervisor "treated many of her subordinates that way." * 1. The plaintiffs' complaints about such action did not amount to protected activity because they "were not protesting, opposing or complaining about current (or even past) discrimination." It was only when they filed a formal complaint with the Department of Military Affairs that a protected activity took place. *Id.*

In contrast to the absence of any mention of discrimination against others on the basis of gender or disability by Mr. Farrone in his missive to Mr. Acker that led to his termination, in the case of *Stezzi v. Aramark Sports, LLC,* 2009 WL 2356866 (E.D. Pa. 2009), the plaintiff on several occasions made written complaints of sexual harassment on behalf of his girlfriend to

their employer accusing the supervisor of questioning the plaintiff about his relationship with her, following her out of work, and writing letters to her of an inappropriate nature. The girlfriend herself also wrote a letter to management describing unwanted sexual advances by the supervisor. This evidence was deemed sufficient to withstand summary judgment on the plaintiff's claim under the PHRA and Title VII that he was illegally retaliated against for complaining of harassment against his girlfriend, as it demonstrated the "requisite good faith belief that [plaintiff] was protesting protected conduct." Id. at * 6. *See also Hubbell v. World Kitchen, LLC, supra*, 88 F. Supp.2d at 438 (complaint "without reference to harassment based on a statutorily-enumerated criterion such as race, sex or age, does not constitute activity entitled to protection under...the PHRA.").

Under the facts of this case and the cited law, the Plaintiff has not established that he engaged in protected activity where he did not specifically complain to Mr. Acker about discrimination against other employees in District Attorney's Office.

**C. Plaintiff Was Not Terminated in Retaliation for Protected Conduct**

The third prong of a *prima facie* case of retaliation requires a causal connection between the protected activity and the adverse action. While Defendant Acker contends that the Plaintiff did not engage in any protected activity, to the extent that the court finds a genuine issue of fact on this, the Plaintiff still must establish that Mr. Acker knew of the protected conduct at the time that he terminated the Plaintiff. *Daniels, supra,* 776 F.3d at 196 ("The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.") (citing cases, including *Ambrose v. Township of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decision makers must be aware of the protected conduct.")).

16

There is no evidence that Mr. Acker knew that Mr. Farrone was engaging in protected conduct in the communication about the reassignment of cases on May 18, 2020, and when he decided to terminate the Plaintiff.  Nothing in the communications between the two suggests otherwise.  Mr. Acker confirmed that when he decided to act on the Plaintiff's employment following the email exchange with Mr. Farrone on May 18, 2020, as it was based on Mr. Acker's belief that the Plaintiff was insubordinate, the two could no longer work together, and that the Plaintiff's vehement opposition to taking on cases clearly indicated that he was not the right person to continue as the First Assistant to Mr. Acker.  Mr. Acker did not consider that Mr. Farrone was engaged in any protected activity for himself or others, only that he was expressing his personal antagonism toward the District Attorney.

Plaintiff may point to the statement in his email to Mr. Acker that accuses the Defendant of harassing Ms. Lauderbaugh by pushing her to resolve her cases, but such evidence is not protected conduct causally related to Plaintiff's termination.  *See Daniels, supra*, 776 F.3d at 199 ("Although SDP may have harassed Daniels, she has not linked any of the harassment to the sort of retaliatory animus necessary to obtain relief under the anti-discrimination statutes on which she relies.") (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)("Many may suffer … harassment at work, but if the reason for the harassment is one that is not proscribed by Title VII [the ADEA or PHRA] it follow that [those statutes] provide no relief.").

The Plaintiff contends that the tenor of Mr. Acker's comments to the ADAs was abusive, belittling or inflammatory, but again, even if such characterization were accurate – which is denied, that does not establish a causal link to prohibited retaliation.  *See Rife v. Borough of Dauphin*, 647 F.Supp.2d 431, 443-44 (M.D. Pa. 2009) ("While it is admirable that plaintiff spoke out against the use of derogatory language by defendant Wynn, it is clear from the record that this opposition was not connected to any unequal treatment of employees or any other activity

protected under Title VII or the PHRA."). *See also Lamb-Bowman v. Delaware State University*, 152 F.Supp.2d 553, 561 (D. Del. 2001) (summary judgment granted on claim of retaliation under Title VII where plaintiff complained of disparities between the men's and women's athletic programs in violation of Title IX, but did not demonstrate that she suffered retaliation because she complained of discrimination based on sex.).

Mr. Farrone also points to the proximity between his May 18, 2020 email and the termination of his employment the next day to establish causation. That argument fails not only because it relies on the presence of protected conduct, which is absent here, but as the Third Circuit has noted, "[i]t is important to emphasize that it is causation, not temporal proximity itself, that is an element of Plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).

That Mr. Acker immediately viewed the Plaintiff's challenge to his authority as District Attorney as insubordinate and without a valid basis is clear from his immediate statement that "maybe I need a new FASA!" and letter of termination, which support that this decision was the result of that exchange, which involved no protected conduct. If anything, the immediacy of Mr. Acker's decision to terminate the Plaintiff after receiving the fateful May 18, 2020 email confirms no link to any protected conduct. There is no evidence that Mr. Acker acted to punish the Plaintiff for challenging him based upon protected conduct.

Retaliation claims such as this involve a heightened causation standard requiring a Plaintiff to establish that their "protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2532 (2013). This standard requires the plaintiff to show "that the harm would not have

occurred" in the absence of – but for – defendant's wrongful conduct. *Id.* at 2525. Otherwise, "it would be inconsistent with the structure and operation of Title VII to so raise the costs, both financial and reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent." *Id.*

Plaintiff here can only meet this standard by showing that his communication with Mr. Acker which precipitated his firing involved protected activity that was a but-for cause of his termination. The evidence of record simply does not support that Mr. Acker sought to punish the Plaintiff in retaliation for communicating alleged discrimination against other employees in the DAs office based on gender, disability or other protected category. There is no evidence of any employee in the DA's office coming forth with a complaint to Mr. Acker or the County[4] that they felt discriminated against by him based on a protected category is critical, and further demonstrates that Mr. Acker did not act in response to such allegations. The facts support that Plaintiff did not voice opposition to discriminatory practices by Mr. Acker, only that he opposed the manner in which Mr. Acker communicated with his ADAs about their work and insisted that they move cases toward resolution - consistent with his philosophy as District Attorney.

There is no evidence that shows the Defendant's reasons for firing the Plaintiff were in retaliation for opposing discrimination or pretextual. The termination letter identifies the non-discriminatory decision by Mr. Acker to take such action that, as a matter of law, cannot be second-guessed by a dissatisfied employee. *See Ezold v. Wolf, Block, Schorr & Solis*, 983 F.2d 509, 527 (3d Cir. 1992) (Third Circuit reversed a District Court's judgment in favor of an attorney denied partnership in a law firm and claimed it was due to sex discrimination, stating that an employer "has the right to make business judgments on employee status, particularly

---

[4] Defendant Acker adopts and incorporates by reference the argument and statements by the County of Mercer in support of its Motion for Summary Judgment that plaintiff never reported discrimination or harassment and was not retaliated against for protected activity.

when the decision involves subjective factors deemed essential to certain positions," and unless

the plaintiff can cast doubt on the employer's articulated reasons for an employment decision, a

Court "will not interfere in an otherwise valid management decision.") (citing cases).

### D.  There Is No Genuine Dispute Of Fact That Defendant's Reasons for Terminating Plaintiff's Employment Were Not Pretextual

If this court finds that the Plaintiff could establish a question of fact on his *prima facie*

case, the defendant would still be entitled to summary judgment by showing that the termination

was made for legitimate, nondiscriminatory reasons, where the Plaintiff cannot establish that the

reasons are not credible or that discrimination was more likely than not the motivation for the

employer's action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

Mr. Acker readily meets his burden of showing that he fired Mr. Farrone for legitimate,

non-discriminatory reasons.  As set forth in the Statement of Concise Facts and exhibits, Plaintiff

was fired based on his flagrant flaunting of a fundamental friction with the District Attorney's

management practices, which culminated the disagreements that had been building between the

two of them.  None of the issues had any foundation in discrimination by Mr. Acker, and no such

motive was ever ascribed to them by the Plaintiff in his May 18, 2020 communication.

Plaintiff alleges that some of the reasons set forth for his termination are not valid, such

as he did not miss as many days from work or take as much vacation or use his cell phone for

personal matters as Mr. Acker identified in the termination letter.  Any dispute on these matters

is immaterial where there is no evidence that these circumstances were a pretext for terminating

the Plaintiff in retaliation for asserting that Mr. Acker discriminated against ADAs, where the

precipitating event was Mr. Farrone's defiance of Mr. Acker's authority in the fateful email.

To establish a pretext that the termination was based on discriminatory animus, the

Plaintiff has to show that the articulated reason is not plausible, inconsistent, or contradictory, or

that it is more likely than not that he was terminated in retaliation for advocating against

discrimination.  It is insufficient to assert that employer's proffered reason for termination of an employee was mistaken.  *Fuentes v. Perskie*, 32 F.3d 759, 762, 765 (3d Cir. 1994).

Plaintiff may also claim that because Mr. Acker had never disciplined him before, that the termination had to have been in retaliation for protected activity.  However, there is no requirement in Mercer County's personnel policies that employees cannot be terminated without progressive discipline, as the employees in the District Attorneys' office were employees at will and the District Attorney has the unfettered authority to fire his employees.  *Westmoreland County v. Westmoreland County Detectives*, 937 A.2d 618, 622 (Pa. Cmwlth. 2007) (holding that 16 P.S. §1620 renders unenforceable a collective bargaining agreement that seeks to impair a row officer's power to supervise, hire and fire their personnel).

The Plaintiff's principal assertions for pretext are his claims that Mr. Acker treated women ADAs unfairly compared to their male counterparts, and that Ms. Lauderbaugh in particular was discriminated against on the basis of gender and a disability.  Both arguments fail to establish a question of fact that Plaintiff himself was terminated because he opposed discrimination against these ADAs.  *Fuentes*, 32 F.3d at 762 (to counter a proffered reason for termination, the plaintiff must show "such weaknesses, implausibilities, inconsistencies or contradictions in the employer's proffered legitimate reasons for its actions.").

The evidence is that Mr. Acker is consistent in his demands that all ADAs prosecute their cases vigorously.  From the beginning of his tenure, Mr. Acker regularly communicated with the ADAs as a group and individually about their cases, including statistics of the number of cases that were resolved, continued and tried.  His emails show the consistent pattern of such communication, and that all the ADAs received both praise and encouragement, not harassment. At most, the emails show a demanding but supportive boss with no evidence of discrimination. Indeed, "evidence suggestive of a demanding work environment … does not equate to racial

discrimination." *Holland-Carter v. UPMC Health Plan, Inc.*, 2024 WL 4729470 (E.D. Pa. 2024) (summary judgment granted on claims of race discrimination and retaliation).

There also is no evidence that any female ADAs made any complaint of gender discrimination to Mr. Acker or Mercer County.  Rather, the evidence is that Plaintiff spoke with the County Human Resources Director, Jennifer Hamilton, and said that Mr. Acker was "too hard" on the ADAs and that his "management style was not one that Mr. Farrone agreed with," and that he was having a "hard time justifying Mr. Acker's management style to them because he didn't agree with it."  Plaintiff did not assert that Mr. Acker had engaged in any discrimination against the ADAs, and indeed denied it when asked by Ms. Hamilton.  The female ADAs themselves did not make any complaint of discrimination to Ms. Hamilton or Mr. Acker.

The focus of the Plaintiff's Complaint regarding ADA Lauderbaugh was Acker's "unreasonable" demands that she "was not moving cases along quickly enough" and that "his expectations for [her] workflow were unrealistic."  *Amended Complaint [ECF 14]* ¶¶ 24-26. Plaintiff has not offered any specific evidence that he challenged Mr. Acker for discriminating against her based on her gender or a disability, only the vague and conclusory statement that he "raised with Acker his objections to Acker's bullying … because she was a woman." *Id.*, ¶28. The reference to "bullying" relates to what is identified as Mr. Acker chastising her for not moving her cases along quickly enough.  *Id.*, ¶¶ 24-25.  This does not set establish protected activity related to gender-based employment discrimination under the Hunan Relations Act.

Under the law actions which may amount to bullying do not support a cognizable claim. "[I]t is well-settled that a supervisor's mere criticism of an employee's work, even when loud or belittling, does not fall within the ambit of Title VII unless his conduct is so severe, pervasive, offensive and 'permeated with discriminatory intimidation' as to alter the terms and conditions of his subordinate's employment." *Lynch v. Nat'l Fuel Gas Distribution Corp.*, 25 F. Supp 3d

358, 365 (W.D.N.Y. 2014) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21(1993)).

Only harassment based on discrimination against a protected class is protected activity; as the

law is not a "general civility code for the American workplace," *Oncale v. Sundowner Offshore*

*Services, Inc.*, 523 U.S. 75, 80-81 (1998). *See also Hubbell, supra,* 688 F.Supp.2d at 432. ("The

issue in this case is not whether World Kitchen's decision to suspend Hubbell was "wise, shrewd,

prudent, or competent," but rather whether it was attributable to Hubbell's sex.).

There is no evidence that Ms. Lauderbaugh herself complained to Mr. Acker or the

County that she believed that Mr. Acker discriminated against her on the basis of gender or a

disability.  Pointedly, she made no statement to that effect to Mr. Acker, and her resignation

letter clearly demonstrates that she did not have any grievance or issue herself with Mr. Acker.

The Plaintiff's reliance on Ms. Lauderbaugh to establish his claim of gender and

disability discrimination is premised on a discussion he had with Mr. Acker well before the

termination in which Mr. Acker told Plaintiff he had spoken with Ms. Lauderbaugh, who

revealed she had depression.  Mr. Acker asked her if she was on medication and if the

medication kept things under control, and she said yes.  Mr. Acker then asked Ms. Lauderbaugh

to let him know if she needed any accommodation.  Mr. Acker also told Mr. Farrone that if she

requested any accommodation, that they should provide it to her, but Ms. Lauderbaugh never

requested an accommodation and her medical condition was not brought up again.  Importantly,

Ms. Lauderbaugh did not cite to any medical condition as disabling her in her work or as a

reason for any issue with her job performance, and Mr. Acker never regarded her as disabled.

This evidence points to an understanding by Mr. Acker of Ms. Lauderbaugh having a

controlled medical condition that did not affect her work, and of which she never made an issue

or sought an accommodation – or used to justify any criticism of her work by Mr. Acker.  There

is no question that Mr. Acker did not consider Ms. Lauderbaugh's situation in firing Mr. Farrone.

## V.    CONCLUSION

Defendant, Peter C. Acker, requests this Court to grant summary judgment in his favor and against the Plaintiff, with prejudice, pursuant to Federal Rule of Civil Procedure 56.

Respectfully submitted,

MARSHALL DENNEHEY, P.C.

By _____
G. Jay Habas
PA ID No.  55581
717 State Street, Suite 701
Erie, PA  16501
(814) 480-7800

LEGAL/156683092.v1

24

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICK BRIAN FARRONE

              Plaintiff

      v.

PETER C. ACKER and THE COUNTY OF
MERCER, PENNSYLVANIA

              Defendants

CIVIL DOCKET NO.  2:23-CV-1528

JURY TRIAL DEMANDED

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Memorandum of Law in

Support of Motion for Summary Judgment was duly served on all counsel of record and

unrepresented parties on the 2nd day of April 2025, electronically or by mailing same to them at

their designated offices by first class United States mail, postage prepaid.

Walter P. DeForest, Esquire
Oscar Heanue, Esquire
Deforest Koscelnik & Berardinelli
436 Seventh Avenue, 30th Floor
Pittsburgh, PA 15219
*Attorneys for Plaintiff*

Robert Vernon, Esquire
Gabriel Fera, P.C.
1010 Western Avenue, Suite 200
Pittsburgh, PA  15233
*Attorneys for Defendant, The County of Mercer*

MARSHALL DENNEHEY, P.C.

By _____
G. Jay Habas