IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK BRIAN FARRONE,<br><br>   Plaintiff,<br><br>   v.<br><br>PETER C. ACKER; and THE COUNTY OF MERCER, PENNSYLVANIA,<br><br>   Defendants. | Civil Docket No.: 2:23-cv-1528 |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
PETER C. ACKER'S MOTION FOR SUMMARY JUDGMENT**

AND NOW comes Plaintiff, Patrick Brian Farrone, by and through his undersigned counsel, who hereby respectfully requests that this Court deny Defendant Peter C. Acker's Motion for Summary Judgment for the reasons set forth below.

**INTRODUCTION**

The present dispute concerns Mr. Farrone's abrupt, public firing from Mercer County's District Attorney's Office after Mr. Farrone voiced his opposition to Defendant Peter C. Acker's sexist and ableist harassment of a particular Assistant District Attorney ("ADA") – *i.e.*, "S". Mr. Acker's abuse – which afflicted both S specifically and other female employees – entailed, *inter alia*, disproportionate chastisement and supervision of female employees or employees suffering from disabilities; use of explicitly sexual derogatory terminology (including "bitch" and "cum dumpster") to describe female employees and victims; extreme, public hostility towards female persons, including Mr. Acker's own daughter, for having children or being parents; and reticence to grant female employees leave to work from home during the Covid-19 pandemic, as required by federal law, and questioning the authenticity of such employees' needs. Prior to his firing, Mr. Farrone had repeatedly made his concerns regarding this abusive and discriminatory behavior

1

known to both Mr. Acker directly and to Mercer County through conversations with Human Resources. Mr. Farrone has testified to such conversations at his deposition, and he has a witness, Joan Mooney, prepared to testify in support thereof. Despite this evidence, Mr. Acker now baldly insists upon this Court that Mr. Farrone never engaged in any form of protected speech, and that Mr. Farrone was not fired for any such speech. These assertions are not only unfounded and unavailing but also raise several issues of material fact that preclude entry of summary judgment. Accordingly, summary judgment must be denied.

## CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS

The factual basis for Mr. Farrone's Response in Opposition to Mr. Acker's Motion for Summary Judgment is set forth in a separate Concise Statement of Undisputed Material Facts (hereinafter, the "SMF"), filed pursuant to Western District of Pennsylvania Local Rule 56(B)(1), which is hereby incorporated by reference. References to exhibits contained herein refer to the items designated in and attached to the SMF.

## APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. Pro. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the nonmoving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

As the movant, Mr. Acker bears the burden of demonstrating "an absence of a genuine issue of material fact by showing the [C]ourt that there is no evidence in the record supporting the nonmoving party's case." *Husick v. Unum Life Ins. Co. of Am.*, 2024 WL 4476554, at *2 (E.D. Pa. 2024) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Only where the record, "taken

as whole, could not lead a rational trier of fact to find for the nonmoving party" should summary judgment be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). For the reasons provided below, Defendant Acker has not met this burden, and, accordingly, summary judgment should be denied.

## ARGUMENT

Mr. Acker essentially makes two arguments in favor of summary judgment: **First**, he asserts that Mr. Farrone's statements cannot, as a matter of law, be deemed "protected activity" because the statements did not expressly characterize Mr. Acker's conduct as specifically discriminatory. **Second**, he asserts that, even presuming the above-mentioned statements could be considered protected activity, Mr. Farrone was not terminated for making them. Neither argument is availing for the reasons provided below.

### I. Mr. Farrone's statements constituted a protected activity because they concern conduct Mr. Acker implicitly understood to be entangled with employees' protected statuses.

Mr. Acker first argues that Mr. Farrone's statements – *i.e.*, the email sent to Mr. Acker after S's forced departure, verbal communications made to Mr. Acker directly, and conversations had with Mercer County's Human Resources department – cannot constitute "protected activity" within the bounds of Title VII and the Pennsylvania Human Relations Act ("PHRA"). Essentially, Mr. Acker argues that, for a statement to be deemed a "protected activity," discrimination must be specifically identified therein. That is, the statement must either include the word "discrimination" or otherwise expressly note that conduct was wrongful as predicated upon a particular protected class. ECF No. 58 at 9-11. He then points out that Mr. Farrone's letter to Mr. Acker does not explicitly use terms like "discriminatory," "ableist," or "sexist," but rather expresses discontent about more generalized "harassment," "borderline threatening" comments, and Mr. Acker's

3

violation of his agreement to allow Mr. Farrone to supervise S. *Id.* at 11-15. Accordingly, Mr. Acker reasons, Mr. Farrone cannot establish "that he engaged in protected activity [because] he did not specifically complain to Mr. Acker about discrimination…." *Id.* at 16; *see also* Acker Affidavit, Acker Exh. 2 (ECF No. 60-2) at ¶ 62 ("[a]t no time during Mr. Farrone's employment did he accuse me of discriminating against the female [ADA]s or [S]").

This is not the first time this Court has considered such arguments. Indeed, Mr. Acker raised nearly the exact same contention as part of his Motion to Dismiss. *See* ECF Nos. 19-20. Now, despite no substantive change in the materials relied on as part of his argument, Mr. Acker revives this contention in hopes of obtaining a second bite at the apple. As was the case when Mr. Acker first raised these arguments, Acker's position misstates the applicable legal standard and misconstrues (or outright ignores) the evidence pending before this Court.

To maintain a claim for retaliation under Title VII and the PHRA, a plaintiff must establish that they (1) engaged in a protected activity and (2) suffered an adverse employment action, and (3) that there is a causal link between the protected activity and the adverse employment action. *Bryant v. Wilkes-Barre Hosp., Co.*, LLC, 2015 WL 539999, at *8 (M.D. Pa. 2015) (*citing Hussein v. UPMC Mercy Hospital*, 466 Fed.Appx. 108, 111–12 (3d Cir. 2012)). It is well-established that "protected activity" may include a wide variety of conduct, including "informal protests of discriminatory employment practices, … making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (*citing Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). Put more simply, "at a minimum, the allegedly protected activity must express, either explicitly or implicitly, opposition to discrimination on the basis of some protected

characteristic, such as race, gender, age, or disability." *Bielek v. Allegheny Ludlum Corp.*, 2006 WL 2773487, at *17 (W.D. Pa. 2006) (internal citation omitted). Mr. Farrone's letter, when considered in tandem with his earlier conduct, constitutes precisely such protected conduct.

In his communication, Mr. Farrone stated that Mr. Acker's emails to S – which included a deeply unreasonable demand that S "[g]et [a] case tried" in less than a month or suffer a "not terribly pleasant chat" with Mr. Acker (*see* Exh. 11) – were "borderline threatening" and violative of Mr. Acker's agreement to allow Mr. Farrone to supervise S. *See* Exh. 19. While neither of these statements expressly used the words "discriminatory," "sexist," or "ableist" to describe Mr. Acker's conduct, such meaning would have been implicitly understood by Mr. Acker considering Mr. Farrone's previous conversations with him and others. *See Reaves v. Pennsylvania State Police,* 2014 WL 486741, at *4 (M.D. Pa. 2014) (police officer did not need to explicitly invoke race in his complaints of unfair treatment to have engaged in protected activity); *Jackson v. Lehigh Valley Physicians Grp.*, 2010 WL 1630737, at *17 (E.D. Pa. 2010) (complaint of "bias" and "harassment" that did not specifically invoke plaintiff's protected characteristics was sufficient to satisfy protected activity element for *prima facie* case of retaliation).

For instance, as noted in Mr. Farrone's deposition, Mr. Farrone and Mr. Acker had several conversations about S's disability, and Mr. Acker agreed to allow Mr. Farrone to supervise S as an accommodation therefor. *See* Exh. 1, Farrone Tr. at 167, 220, 232-33.[1] Further, Mr. Acker

---

[1] Mr. Acker outright denies the occurrence of these conversations in his recent affidavit (*see* Acker Exh. 2 (ECF No. 60-2) at ¶ 64 ("[t]here was no further discussion about [S's disability and the accommodation thereof]"). Defendant Mercer County, however, agrees that such conversations occurred and that the purpose underlying Mr. Farrone's supervision was to accommodate S's disability. *See* ECF No. 56, ¶ 48 ("Mr. Farrone thought an appropriate accommodation for Ms. Lauderbaugh would be for Mr. Acker, her boss and direct supervisor, to leave her alone and not be so focused on her and so critical of her handling of the cases" (internal quotation and bracketing omitted)). Clearly, at the very least, there is a genuine factual dispute as to the nature and scope of Mr. Farrone and Mr. Acker's conversations concerning S's disability.

5

acknowledged in his deposition that he understood and considered S to be disabled. *See* Exh. 8, Acker Tr., at 39-40. Accordingly, when Mr. Farrone contested Mr. Acker's violation of the supervision agreement, Mr. Acker reasonably would have understood this to mean he was violating his obligation to provide – and depriving S of – an accommodation for S's disability. That concern is not merely a disagreement as to Mr. Acker's "management style" – rather, it is vehement opposition to the explicitly discriminatory and ableist tendencies exhibited by Mr. Acker. *See Bushra v. Main Line Health, Inc.*, 709 F.Supp.3d 164, 173 (E.D. Pa. 2023) ("opposing the allegedly unlawful denial of a[n] accommodation … is [a] protected activity under Title VII" for the purposes of a retaliation claim).

Further, several ADAs brought their concerns regarding Mr. Acker to Mr. Farrone's attention, hoping Mr. Farrone would be able address such problems by having productive conversations with Mr. Acker. *See, for instance,* Exh. 1, Farrone Tr. at 163. These concerns frequently regarded what ADAs considered to be sexist tendencies exhibited by Mr. Acker – such as unduly punishing or supervising female ADAs where male ADAs received no such oversight for similar behavior – and Mr. Farrone did, in fact, speak to Mr. Acker about such concerns. *Id.* While Mr. Farrone need not outright accuse Mr. Acker of being sexist or ableist as a matter of professional respect to his superior (or in hopes of fostering actually productive conversations), the exact nature of the conduct discussed could leave little doubt in the reasonable mind that sex and/or disability discrimination was the concern at issue. This implicit understanding is perhaps most stark in Mr. Farrone's conversation regarding Mr. Acker's use of the term "bitch" in reference to female ADAs. Mr. Farrone informed Mr. Acker that female ADAs took offense to being referred to as "bitches" – regardless of whether Mr. Acker considered the remark to be a compliment – and insisted that Mr. Acker stop using the term. *Id.* at 240. Mr. Acker, however,

continued to call female employees "bitches." *Id.* The only reasonable explanation for why female employees would be offended by the term "bitch" being used to describe them is because that term has specifically gendered, derogatory implications. Mr. Acker is an experienced attorney – it is beyond doubt that he would be able to read between the lines and understand (1) that the conduct brought to his attention by Mr. Farrone was discriminatory as creating an environment demeaning and hostile to women, and (2) that Mr. Farrone was referencing such conduct when he identified harassment and problematic behaviors in his letter. *See Kengerski v. Harper*, 6 F.4th 531, 537 (3d Cir. 2021) (allowing retaliation claim to be predicated on the hostile work environment created by discriminatory conduct in the workplace); *Patel v. CF Fresh LLC*, 2022 WL 16747276, at *16 (E.D. Pa. 2022) (allowing retaliation claim to proceed where plaintiff complained about discriminatory comments because said comments created an environment hostile to certain protected characteristics). Similarly, Farrone's request that Acker allow him to supervise S in a conversation about S's disability could not be mistaken by Acker to be for a reason unrelated to her disability.

  Accordingly, Mr. Farrone's conduct was implicitly in opposition to discriminatory employment practices and, thusly, qualifies as a "protected activity" within the bounds of Title VII and the PHRA. To hold otherwise would be contrary to prevailing law and the weight of the evidence, and would impose fundamentally unreasonable requirements upon employees who simply wish to protect themselves and others from wrongful conduct. It would also be an unproductive rule for a lower-level supervisor to have to label the supervisor, to their face, a discriminator.

**II.    Mr. Farrone was fired for making his protected statements.**

Mr. Acker next asserts that, "to the extent that the [C]ourt finds a genuine issue of fact" as to whether Mr. Farrone's conduct constituted protected activity, Mr. Farrone cannot establish a connection between said activity and being fired because "[t]here is no evidence that Mr. Acker knew that Mr. Farrone was engaging in protected conduct … when he decided to terminate [] Plaintiff." ECF No. 58 at 16-17. Essentially, Mr. Acker argues that, for the third element of retaliation (*i.e.*, a causal connection between the protected activity and the adverse employment decision) to be fulfilled, a plaintiff must prove that the defendant was (1) *subjectively* aware that the plaintiff's conduct constituted protected activity, and (2) that the defendant made the adverse employment decision specifically because the conduct was protected. This argument either vastly misstates or misunderstands the applicable law.

First, there is absolutely no support for asserting that the defendant in a retaliation case must subjectively understand the conduct in issue to be a protected activity prior to making the adverse employment decision. Rather, so long as an employer "could reasonably have understood[] that the plaintiff's opposition was directed at conduct prohibited by Title VII," retaliation claims can proceed. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013) (*quoting Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). For the reasons provided above, reasonable minds most certainly could have interpreted Mr. Farrone's statements as directed towards Mr. Acker's discriminatory conduct.

Second, there is no requirement that the defendant make an adverse employment decision specifically because the plaintiff's activity was protected. Indeed, as the above standard suggests, an employer may be found liable for retaliation even when subjectively unaware that the plaintiff's conduct was protected. Therefore, whether the employer perceived the underlying activity as protected and responded for that reason is irrelevant – the only inquiries, as the elements of

retaliation prescribe, are whether (1) plaintiff engaged in an activity, (2) defendant took an adverse employment action against plaintiff, (3) the activity plaintiff engaged in was protected, and (4) defendant took that action because plaintiff engaged in the activity. *Id.* at 14.

It is beyond question that Mr. Farrone has, at the very least, made a *prima facie* showing as to each of these inquiries: (1) All parties acknowledge that Mr. Farrone sent Mr. Acker an email on May 18, 2020, that expressed concerns over Mr. Acker's conduct towards S and the other ADAs; (2) all parties acknowledge that Mr. Farrone was terminated the day after he sent the email; (3) sending the email was a protected activity because it concerned conduct that Mr. Acker reasonably should have understood to refer to discriminatory conduct (*see supra.* § I); and (4) several indicators suggest that Mr. Farrone was fired because he sent the email.

For instance, a mere twenty-two minutes after Mr. Farrone sent the email, Mr. Acker replied stating: "Perhaps I should get a new FADA."  Exh. 20.  This remark – which is, quite literally, directly in response to Mr. Farrone's email – clearly indicates that Mr. Acker intended to fire Mr. Farrone.  Mr. Farrone was then formally dismissed less than twenty-four hours later.  Courts have repeatedly held that temporal proximity between the protected activity and the adverse employment action is more than sufficient evidence to establish *prima facie* causation in retaliation cases.  *See Javitz v. Luzerne County*, 293 A.3d 570, 585, at n. 20 (Pa. 2023) (enumerating "the temporal relationship between the protected activity and the retaliatory discharge" as one element capable of "establish[ing] connection in light of the totality of the circumstances" in retaliation cases); *see also Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006) (allowing "brevity of the time periods between the protected activity and alleged retaliatory actions to prove causation"); *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005) ("when only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such

9

temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn"); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) ("[plaintiff] demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [defendant's] receipt of notice of [plaintiff's] EEOC claim").

Furthermore, the fact that Mr. Acker was assigning cases to Mr. Farrone only two days prior clearly indicates that Mr. Farrone's firing was not already in the works before Mr. Farrone's email of May 18, 2020. *See* Exhs. 13, 14. Indeed, Mr. Acker directly stated that he was relying on "[e]very senior attorney," including Mr. Farrone, "to pitch in" and handle S's displaced cases. Exh. 17.

Finally, Mr. Farrone's termination notice included a number of false, spurious grounds for his termination. These included, *inter alia*, allegedly "significantly abus[ing] [his] vacation allotments," "frequently arriv[ing] late and le[aving] early," failing to "engage" with Mr. Acker's "calls of the lists," and removing a spare desk that was in Mr. Farrone's office. Exh. 21. As confirmed in his deposition, Mr. Acker never spoke to Mr. Farrone about any of these alleged issues at any point or disciplined Mr. Farrone in any way. *See* Exh. 8, Acker Tr. at 26-30. Such an absence of discipline is indicative of pretextual grounds for dismissal, and pretext of this sort is sufficient to infer discriminatory intent. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) ("[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination"); *see also Miller v. CIGNA Corp.*, 47 F.3d 586, 596 (3d Cir. 1995) ("[a] finding that the employer's nondiscriminatory explanation is a pretext permits … the trier of fact to conclude that the employer

discriminated against the plaintiff based on the ground alleged"); *Armbruster v. Unisys Corp.*, 32 F.3d 768, 783 (3d Cir. 1994) (discussing *St. Mary's*, "the factfinder's disbelief of the defendant's explanation may … suffice to show intentional discrimination because it allows the trier of fact to infer the ultimate fact of intentional discrimination" (internal quotation omitted)); *Seman v. Coplay Cement Co.*, 26 F.3d 428, 433 (3d Cir. 1994) ("*Hicks* teaches ... that rejection of the employer's proffered nondiscriminatory reason will permit the trier of fact to infer the ultimate fact of intentional discrimination" (emphasis omitted)); *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 136 (3d Cir. 1997) ("proof of pretext … may be combined by the factfinder with the evidence used to support the plaintiff's prima facie case …, and from this union, the factfinder may reasonably infer that the defendant discriminated against the plaintiff…" (emphasis omitted)).  Mr. Acker also admits these reasons were spurious, as in his affidavit, he ascribes firing Mr. Farrone merely to his "clear disagreement with [Mr. Acker's 'management style']," not any of the reasons provided above.  Acker Exh. 2 (ECF No. 60-2) at ¶ 69.

Mr. Acker may attempt to argue, as he does in his Motion and affidavit, that it was unreasonable for him to understand that Mr. Farrone's complaints targeted his discriminatory conduct or that he fired Mr. Farrone for reasons independent from Mr. Farrone's protected activity.  *See Id.* at ¶ 68.  The truth of such assertions, however, are factual determinations for a jury to decide, and Mr. Farrone has presented more than sufficient evidence to bring this matter before one.  Accordingly, genuine issues of material fact preclude dismissal of the claims *sub judice*, and summary judgment must be denied.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant Peter C. Acker's Motion for Summary Judgment.

Respectfully submitted,

/s/ Walter P. DeForest
Walter P. DeForest, PA ID No. 05009
Marie DeForest Garcia, PA ID No. 209090
Alec R. Smith, PA ID No. 334114
DEFOREST KOSCELNIK & BERARDINELLI
436 Seventh Avenue, 30th Floor
Pittsburgh, PA 15219-1831
Phone: (412) 227-3100; Fax: (412) 227-3130
Email:  deforest@deforestlawfirm.com
        mdeforest@deforestlawfirm.com
        smith@deforestlawfirm.com

*Counsel for Plaintiff*
*Patrick Brian Farrone*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 23rd day of April, 2025, I electronically filed a true and correct copy of the foregoing *Response in Opposition to Defendant Peter C. Acker's Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

      /s/ Walter P. DeForest
      Walter P. DeForest